UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
In re:

                                                 Case No. 810-73228-reg

SCOTT F. SMITH,
PAULA N. SMITH,

                                                 Chapter 7

                         Debtors.
----------------------------------------------------------------x
J.P. MORGAN CHASE BANK, N.A., AS
SUCCESSOR BY MERGER TO WASHINGTON
MUTUAL BANK, F.A.,

                         Plaintiff,

       - against -                                Adv. Proc. No. 810-08303-reg

SCOTT F. SMITH,

                         Defendant.
----------------------------------------------------------------x

## <u>DECISION AFTER TRIAL</u>

        Before the Court is an adversary proceeding commenced by J.P. Morgan Chase Bank,

N.A. (the "Plaintiff"), as successor by merger to Washington Mutual Bank, F.A. ("WaMu"),

seeking a determination that a mortgage debt (the "Mortgage Debt") owed by Scott F. Smith (the

"Debtor") is non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(B).  This dispute arises out of

a $1,396,500 mortgage loan (the "Mortgage Loan") made by WaMu to the Debtor in November

of 2007 in connection with the Debtor's purchase of real property located at 259 May Drive,

Santa Rosa Beach, Florida 32459 (the "Property").  The Plaintiff alleges the Mortgage Loan was

made in reliance upon the Debtor's representations as set forth in his loan application (the "Loan

Application"), which ultimately were revealed to be materially false.

        The Debtor concedes that the representations in the Loan Application provided to WaMu

by the Debtor's mortgage broker, Franklin First Financial, Ltd. ("Franklin First") were false.  *See*

Tr. Ex. 42, Oct. 20, 2010 Dep. Tr., 35-37; 70:11-25; 71:1-8.  However, the Debtor maintains that he executed the form loan documents in blank and that Franklin First, without his knowledge, submitted the false Loan Application to WaMu.  The Debtor argues that the Plaintiff has failed to sustain its burden under section 523(a)(2)(B) of the Bankruptcy Code (the "Code") to prove by a preponderance of the evidence that the Debtor intended to deceive WaMu and that WaMu, in making the Mortgage Loan, reasonably relied on the misrepresentations contained in the Loan Application.  In furtherance of this argument, the Debtor posits that Franklin First was in fact an agent of WaMu and because Franklin First knew the information contained in the Loan Application was false, WaMu as the principal can not have reasonably relied on the misrepresentations in the Loan Application.

For the reasons that follow, the Court finds that the Plaintiff has sustained its burden under section 523(a)(2)(B) and accordingly finds the Mortgage Debt to be non-dischargeable. The evidence presented at trial shows that WaMu's reliance on the false financial information provided in the Loan Application was reasonable under the circumstances.  In approving the Mortgage Loan, WaMu complied with its review practices in place at the time of the loan, which were also practices used throughout the industry.  There were no red flags that would have put WaMu on notice of the material false information in the Loan Application.  The Court also finds that in placing the loan, Franklin First was not acting as WaMu's agent, and therefore Franklin First's knowledge of the falsity of the information provided in the Loan Application cannot be imputed to WaMu.  Finally, the Court finds that the Plaintiff has proven that the Debtor possessed the requisite intent to deceive WaMu when he submitted the false financial information.  At the trial before this Court, the Debtor declined to testify and instead exercised

his Fifth Amendment right against self-incrimination.  As a result of the Debtor's failure to

testify, the Court has drawn an adverse inference that the Debtor's testimony would have borne

out his intent to deceive WaMu.  This Court's conclusion that the Debtor intended to deceive

WaMu by use of a false written statement concerning his financial condition is reflected not only

by the record presented to this Court, but also by the Debtor's April 20, 2012 conviction in a

Florida federal court on bank fraud, mail fraud, and money laundering charges stemming, in part,

from the transaction at issue in this case.

*Facts*

In early 2007, Louis Mazzella—the Debtor's brother-in-law and an employee of Franklin

First—introduced the Debtor to his co-worker Jason Vitulano ("Vitulano").  The Debtor and

Vitulano met in Florida at Franklin First's offices where they discussed the acquisition of the

Property, which Vitulano explained could be bought and sold for a profit within a month.  The

Debtor then provided Vitulano with personal information to assist in preparing a loan

application.  In November of 2007, Vitulano submitted the Debtor's Loan Application to WaMu

seeking a mortgage loan in the amount of $1,396,500.[1]  The Loan Application stated that the

Debtor earned $432,000 per year, that he was employed as Vice President for Identification

Solutions located at 365 NE 6th Street, Boca Raton, Florida for nearly two and a half years, that

he had tendered $468,500 as a down payment towards the purchase of the Property, that no part

of the down payment had been borrowed, and that he intended to occupy the Property as a

primary residence.

---

[1]The Debtor, Vitulano, and Mazzella later engaged in another similar transaction in connection
with a separate Florida property located at 13 Cherry Laurel Drive, Santa Rosa Beach, Florida, for which
the Debtor was convicted of, and Mazzella pleaded guilty to, conspiracy to commit bank and mail fraud,
bank fraud, mail fraud, and conspiracy to commit money laundering.

These representations were false.  In actuality, the Debtor was employed by National Grid as a meter reader earning approximately $60,000 per year, was never employed by Identification Solutions, never made a down payment on the Property, and never intended to reside at the Property.  *See* Aug. 23, 2011 Trial Tr., 5-6; Tr. Ex. 2; Tr. Ex. 42, Oct. 20, 2010 Dep. Tr., 35; 53; 70:11-14.  The Loan Application, a "Low Doc"[2] application which bore the Debtor's signature, was prepared and counter-signed by Vitulano on behalf of Franklin First, which acted as the mortgage broker in this transaction.  Prior to approving the Mortgage Loan, in accordance with standard practices WaMu conducted a credit check of the Debtor which indicated that the Debtor had a high credit (FICO) score.  The Debtor attended the November 2007 closing in Florida and executed the closing documents.  Based on the foregoing information, WaMu loaned the Debtor $1,396,500 to purchase the Property.  The Mortgage Loan was secured by a first mortgage.

WaMu subsequently concluded that the Debtor was not a *bona fide* purchaser of the Property.  Rather, the Debtor was acting as a "straw buyer" in furtherance of an alleged mortgage fraud and criminal conspiracy with others, including Vitulano, Premiere Title at Metro, LLC ("Premiere Title"), Premiere Holding and the sellers of the Property.[3]  Premiere Title, a title

---

[2]Plaintiff's witness, Peter Katsikas—an employee of J.P. Morgan Chase and former employee of WaMu from 2002 until its September 2008 merger with Chase—testified that it was industry standard at the time of the Debtor's Loan Application for lenders to issue loans based on "Full Doc", "Alt Doc" or "Low Doc" documentary submissions.  A "Low Doc" application like the Debtor's would typically contain a representation of the Debtor's monthly income, without proof.  In exchange for not requiring further documentation and assuming additional risk, a lender would charge a borrower a higher premium on "Low Doc" loans.  *See* Aug. 16, 2011 Trial Tr., 36-38.

[3]Vitulano was convicted of wire fraud as well as attempt and conspiracy to commit mail fraud and received a 63-month federal prison sentence, although it is not clear that the alleged fraud in this matter was a basis for his conviction.  *See* Tr. Ex. 6.

company retained by Franklin First, failed to disclose in its title report to WaMu the existence of a prior recorded mortgage against the Property in the amount of $1,225,000 held by LaSalle Bank. As a result, LaSalle Bank's mortgage lien was not satisfied at closing. The loan proceeds were disbursed with $850,000 being paid to Premiere Holding, and $410,704.08 paid to the sellers of the Property. According to the Debtor, he neither paid nor received any consideration in connection with the purchase of the Property, although this point is disputed by the Plaintiff.

In January 2008, LaSalle Bank filed a *lis pendens* and action to foreclose its first lien against the Property. Soon thereafter, WaMu recorded the Mortgage Loan against the Property. In June 2008, a final judgment of foreclosure was granted to LaSalle Bank, which foreclosed any interest WaMu held in the Property. At this time, the Debtor was in default under the terms of the WaMu note and mortgage.

*Procedural History*

On April 29, 2010, the Debtor and his wife filed a joint petition for relief under chapter 7 of the Code. On July 16, 2010, the Plaintiff commenced the instant adversary proceeding seeking a determination that the Mortgage Debt is non-dischargeable under 11 U.S.C. § 523(a)(2)(B).

A trial on the complaint was commenced on August 16, 2011 and completed on August 23, 2011. On September 6, 2011, the Debtor filed post-trial findings of fact and conclusions of law. ECF No. 38. On September 14, 2011, the Plaintiff filed post-trial findings of fact and conclusions of law, as well as a post-trial memorandum of law in support of its position—ECF Nos. 41 and 40, respectively—at which time the Court took this matter under submission.

*Burden of Proof*

In an action commenced to determine the dischargeability of a debt, the burden of proof lies with the Plaintiff under a preponderance of the evidence standard. *Grogan v. Garner*, 498 U.S. 279, 286 (1991). "Exceptions to discharge under § 523 must be . . . construed so as to give maximum effect to the Code's policy of providing honest but unfortunate debtors with a 'fresh start.'" *Scheidelman v. Henderson* (*In re Henderson*), 423 B.R. 598, 624 (Bankr. N.D.N.Y. 2010) (quoting *Contini v. Cook* (*In re Cook*), 2009 WL 2872864, at **3-4 (Bankr. N.D.N.Y. Apr. 7, 2009)). It therefore follows that exceptions to discharge will necessarily be construed strictly against the plaintiff and construed liberally in favor of the debtor. *See Hudson v. Raggio & Raggio, Inc.*, 107 F.3d 355, 356 (5th Cir. 1997). There must be satisfactory proof of each element of each cause of action asserted by the Plaintiff, or judgment shall be entered for the Debtor.

*Section 523(a)(2)(B)*

Section 523(a) specifies which debts are excepted from discharge. Section 523(a)(2)(B) provides an exception from discharge for any debt:

> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by—
> (B) use of a statement in writing—
> (i) that is materially false;
> (ii) respecting the debtor's or an insider's financial condition;
> (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
> (iv) that the debtor caused to be made or published with the intent to deceive.

11 U.S.C. § 523(a)(2)(B).

There is no dispute that the Loan Application was a statement "in writing", that was "materially false", "respecting the [D]ebtor's financial condition." *Id.* Notwithstanding these

falsehoods, the Debtor argues that the Plaintiff failed to prove, as is required under section 523 of the Code, that its predecessor WaMu reasonably relied on the misstatements in the Loan Application and that the Debtor intended to deceive WaMu.  The Debtor also argues that Franklin First was WaMu's agent and therefore, under applicable agency principals, the Plaintiff cannot now claim that it was defrauded or in fact relied upon the false representations contained in the Loan Application.

*Reasonable Reliance*

To prevail on a complaint under section 523(a)(2)(B), the Plaintiff must show the debt was obtained by a materially false statement in writing and the Plaintiff reasonably relied on the false statement.  11 U.S.C. § 523(a)(2)(B)(iii).  The reasonableness of a creditor's reliance on a false statement is an objective determination, and the focus is upon the degree of care that a reasonably prudent creditor would exercise under similar circumstances.  *FDIC v. Reisman* (*In re Reisman*), 149 B.R. 31, 39 (Bankr. S.D.N.Y. 1993).  In determining whether a creditor's reliance was reasonable, courts consider the following factors:

> (1) the creditor's standard practices in evaluating credit-worthiness (absent other factors, there is reasonable reliance where the creditor follows its normal business practices);
> (2) the standards or customs of the creditor's industry in evaluating credit-worthiness (what is considered a commercially reasonable investigation of the information supplied by the debtor); and
> (3) the surrounding circumstances existing at the time of the debtor's application for credit (whether there existed a "red flag" that would have alerted an ordinarily prudent lender to the possibility that the information is inaccurate, whether there existed previous business dealings that gave rise to a relationship of trust, or whether even minimal investigation would have revealed the inaccuracy of the debtor's representations).

*Citik Ka Wah Bank Ltd. v. Wong* (*In re Wong*), 291 B.R. 266, 275 (Bankr. S.D.N.Y. 2003) (citing *Ins. Co. of N. Am. v. Cohn*, 54 F.3d 1108, 1117 (3d Cir. 1995)).

Courts reviewing the reasonableness of a creditor's decision to lend should be deferential to that creditor's business judgment. *In re Wong*, 291 B.R. at 275-76 (holding that "creditors are not [generally] required to conduct an investigation outside of ordinary business practices before entering into agreements with prospective debtors and courts should not use the reasonable reliance requirement to second guess a creditor's decision to lend money") (citing *Harris Bank Oakbrook Terrace v. Corrigan* (*In re Corrigan*), 2003 WL 261919 at *12 (Bankr N.D. Ill. Feb. 6, 2003)).  Once a creditor has met its burden to establish that a debtor furnished it with a materially false financial statement, "the reasonableness requirement of § 523(a)(2)(B) cannot be said to be a rigorous requirement, but rather is directed at creditors acting in bad faith." *Nat'l Union Fire Ins. Co. of Pittsburgh, P.A. v. Bonnanzio*, 91 F.3d 296, 305 (2d Cir. 1996) (quoting *Bank One, Lexington, N.A. v. Woolum*, 979 F.2d 71, 76 (6th Cir.1992)) (other citations omitted). Therefore, reasonableness is "a low hurdle for the creditor to meet, and is intended as an obstacle only for creditors acting in bad faith." *Id.* at 305 (quoting *Hong Kong Deposit and Guar. Co. Ltd. v. Shaheen*, 111 B.R. 48, 53, (S.D.N.Y. 1990)).  While WaMu's reasonable reliance on the Debtor's misrepresentations is a relatively low threshold to meet, whether that threshold has been met is a question of fact. *Id.* at 305.

Franklin First, acting through Vitulano and in coordination with the Debtor, submitted a "Low Doc" Loan Application to WaMu. *See* Aug. 16, 2011 Trial Tr., 38:24-25; 39:2.  Plaintiff's witness, Peter Katsikas ("Katsikas")—an employee of the Plaintiff and former employee of WaMu from 2002 until its September 2008 merger with the Plaintiff—testified that when issuing "Low Doc" loans, it was common practice for WaMu and other banks to rely on brokers to obtain and submit the appropriate financial disclosures and appraisal. *Id.* at 36-37.

Subsequently, these banks would conduct their own credit check and verification of the appraised value of the subject property. *Id.* According to Katsikas, at the time of the Loan Application WaMu's standard review process for "Low Doc" mortgage applications was similar to the standard practices of other major banks. *Id.* at 119:3-6. Katsikas further testified that WaMu would never have approved the Loan Application absent the misrepresentations regarding the Debtor's purported income and down payment. *See* Aug. 16, 2011 Trial Tr., 44:2-8.

The record before the Court establishes that WaMu complied with its review practices that were in place at the time of the Loan Application, that those practices were similar to practices in use throughout the industry at the time, and that following those practices raised no obvious red flags which placed WaMu on notice that the Loan Application contained material false representations. Beyond the Loan Application, WaMu's credit check of the Debtor revealed that the Debtor had a strong FICO score, consistent with the Loan Application. If the Debtor's FICO score was abnormally low in comparison to the rest of the Debtor's financial information, this would have been a red flag and would have placed WaMu on notice of a problem. However, no such evidence was presented to the Court. Accordingly, based on the record, the Court finds that WaMu actually and reasonably relied on the false representations contained in the Loan Application.

*Agency*

The Debtor argues that Franklin First was in fact WaMu's agent when it prepared the Loan Application, and therefore, WaMu is deemed to have known that the information was false. The Plaintiff, as WaMu's successor, cannot therefore argue that it had no knowledge the Loan

Application contained false information and that it reasonably relied on the false information. *See* Debtor's Prop. Findings of Fact and Concl. of Law., ECF No. 38.  In support of this theory, the Debtor cites to a variety of  standards for establishing agency relationships under New York law, including that agency is established by the manifestation of the principal that the agent shall act for him, the agent's acceptance of the undertaking, and the understanding of the parties that the principal is to be in control of the undertaking.  The Debtor also relies on the proposition that an agency relationship can be established by actual, implied or apparent authority.  *Id.*

The Debtor argues that WaMu was aware Franklin First was purporting to act on WaMu's behalf and that WaMu ratified these actions.  According to the Debtor, WaMu's consent to and ratification of Franklin First's actions in originating loans created an actual agency relationship between Franklin First and WaMu.  *Id.*  In support of this theory, the Debtor argues that WaMu's consent was evidenced by the fact that it supplied computer software, forms and support so Franklin First could originate loans, and compensated Franklin First for its actions on WaMu's behalf.  The Debtor argues, in the alternative, that WaMu is precluded from asserting its claim against the Debtor on the basis of Franklin First's apparent authority to act as WaMu's agent.  *Id.*  The Plaintiff's response to these arguments is to point out that there is no evidence or  support for the Debtor's agency theories.  *See* Pl. Post-Trial Mem. of L., ECF No. 40.  The Court agrees with the Plaintiff that the Debtor has failed to establish the existence of a legally-binding agency relationship between WaMu and Franklin First.

First, the Court finds that Florida—not New York—law applies to this analysis.  The November 2007 closing took place in Florida, the Mortgage Loan was executed in Florida, both WaMu and Franklin First conducted their dealings in Florida, and the Property was located in

Florida.  Under Florida law, agency is a legal relationship created by an express or implied agreement, or by operation of law, whereby the agent is authorized to act for the principal. *Ocana v. Ford Motor Co.*, 992 So. 2d 319 (Fla. Dist. Ct. App., 3d Dist. 2008).  "Essential to the existence of an actual agency relationship is (1) acknowledgment by the principal that the agent will act for [it], (2) the agent's acceptance of the undertaking, and (3) control by the principal over the actions of the agent."  *Beach Cmty. Bank v. St. Paul Mercury Ins. Co.*, 635 F.3d 1190, 1199 (11th Cir. 2011) (quoting *Villazon v. Prudential Health Care Plan, Inc.*, 843 So. 2d 842, 853 n.10 (Fla. 2003)); *see also Goldschmidt v. Holman*, 571 So. 2d 422, 424 n.5 (Fla. 1990) (same).  For a finding of an agency relationship, "[b]oth the principal and the agent must consent to the agency; a mere association is insufficient."  *Haynes v. Wilder Corp. of Del.*, 721 F. Supp. 2d 1218, 1225 (M.D. Fla. 2010).

"Apparent authority is authority which a principal knowingly tolerates or permits, or which the principal by its actions or words holds the agent out as possessing."  *Roessler v. Novak*, 858 So. 2d 1158, 1161 (Fla. App. 2003) (quoting *Taco Bell of Cal. v. Zappone*, 324 So. 2d 121, 123 (Fla. App. 1975)).  The appearance of an agency relationship and, in turn, the authority to act on behalf of the principal may be established when "the principal knowingly permits the agent to act [as if the agent] is authorized . . . or by silently acting in a manner which creates a reasonable appearance of an agent's authority."  *Ja Dan, Inc. V. L-J Inc.*, 898 F.Supp. 894, 900 (S.D. Fla. 1995) (internal citations omitted).  The doctrine of apparent authority functions to estop a principal from denying the authority of the agent when the principal permitted an appearance of authority in the agent.  *Id.*  To successfully establish apparent authority, the Debtor must show that: (1) the principal made some representation that a

reasonable person would perceive to acknowledge or affirm the authority of the purported agent

to act on the principal's behalf, (2) the proponent relied on that representation in dealing with the

agent, and (3) the proponent materially changed position in reliance on the principal's

representation.  *See Mobil Oil Corp. v. Bransford*, 648 So. 2d 119, 121 (Fla. 1995); *Ideal Foods*

*Inc. v. Action Leasing Corp.*, 413 So. 2d 416, 418 (Fla. App. 1982).

The record reflects that the Debtor executed an agreement acknowledging that Franklin

First was acting as his mortgage broker.  *See* Tr. Ex. 3.  Plaintiff's witness, Katsikas, testified

that he believed WaMu and its brokers were always entirely independent of one another and that

no agency relationship existed.  *See* Aug. 16, 2011 Trial Tr., 57:1-3; 64:5-8.  Nothing in the

record establishes that Franklin First had any actual authority to bind WaMu to a promise of a

loan or to control the ultimate terms upon which a loan would be offered to the Debtor.  There is

nothing in the record to establish that Franklin First was acting for WaMu when it submitted the

Loan Application.  Rather, the fact that Franklin First applied for the Mortgage Loan with

WaMu on behalf of the Debtor, while supplying WaMu with the Debtor's financial information,

supports a view that Franklin First was acting on the Debtor's behalf in procuring the Mortgage

Loan.[4]  In addition, the record is barren of any facts that support a finding that Franklin First had

apparent authority to act on WaMu's behalf.

Even assuming, *arguendo*, that the Debtor sufficiently satisfied the first two requirements

for a finding of an agency relationship, the Debtor has failed to submit any convincing

evidence—and only makes conclusory allegations—in support of the third requirement, WaMu's

---

[4]Notably, the Debtor acknowledges meeting with Franklin First representatives prior to applying for the Mortgage Loan and does not dispute that Franklin First sought to obtain the Mortgage Loan on his behalf, with his permission.

control over Franklin First.  While WaMu established the process that was required to obtain the

Mortgage Loan, it did not control Franklin First's actions with respect to the Debtor.  The

Debtor's papers are bereft of any allegation of the tell-tale signs of a principal-agent relationship,

such as evidence that Franklin First was on WaMu's payroll or evidence that WaMu provided

health insurance or any other benefits to Franklin First employees.  The Debtor has also failed to

provide evidence that WaMu's actions or inaction conveyed apparent authority to Franklin First

to act on WaMu's behalf.  Accordingly, the Court finds that the Debtor has failed to support its

position with sufficient evidence for the Court to conclude that Franklin First was the agent of

WaMu.

*Debtor's Intent to Deceive*

   Finally, the Debtor argues that the Plaintiff has failed to sustain its burden to prove that

the Debtor intended to deceive WaMu.  In cases such as this, intent to deceive is rarely

established by direct evidence.  *See Cohn*, 54 F.3d at 1118; *Barristers Abstract Corp. v.

Caulfield* (*In re Caulfield*), 192 B.R. 808, 821 (Bankr. E.D.N.Y. 1996).  However, intent may be

inferred from a totality of the circumstances of the case, *Bonnanzio*, 91 F.3d at 301, or it may be

inferred "[w]here . . . a person knowingly or recklessly makes a false representation which the

person knows or should know, will induce another to make a loan."  *Burbank v. Capelli* (*In re

Capelli*), 261 B.R. 81, 91 (Bankr. D. Conn. 2001) (quoting *Bethpage Fed. Credit Union v. Furio*,

77 F.3d 622, 625 (2d Cir. 1996)).

   The record before the Court supports a finding of the Debtor's intent to deceive.  It is

undisputed that the Loan Application was replete with false information.  These fabrications,

concerning material financial information of the Debtor, were intended to create an artificial

financial picture in order to induce WaMu to issue the Mortgage Loan.  Most of the loan

documents contained the Debtor's signature, which the Debtor does not dispute.  In his

deposition, the Debtor testified that the signature on many falsified documents in the Loan

Application "appeared to be" his signature and later that he did, in fact, sign parts of the Loan

Application.  *See* Tr. Ex. 42, Oct. 20, 2010 Dep. Tr., 46-49.  The Loan Application

misrepresented the Debtor's assets, income, employment, and intent to occupy the Property.  The

Debtor did not present any evidence or testimony that would allow the Court to conclude

anything but that the Loan Application was signed by the Debtor containing material false

financial information.

At trial, the Debtor had an opportunity to present any defenses to the Loan Application

and testify.  Foregoing that right, he invoked his Fifth Amendment privilege.  *See* Aug. 23, 2011

Trial Tr., 7-15.  In a civil matter where a party asserts his Fifth Amendment privilege, the trier of

fact may draw a negative inference.  *See Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976) ("[T]he

Fifth Amendment does not forbid adverse inferences against parties to civil actions when they

refuse to testify in response to probative evidence offered against them."); *see also SEC v.

Monterosso*, 746 F. Supp. 2d 1253, 1262 (S.D. Fla. 2010) ("[C]ourts routinely exercise their

discretion to permit the drawing of adverse inferences where a party or non-party has invoked

the privilege.").  The Court will draw an adverse inference against the Debtor in this case that

Debtor signed the Loan Application containing materially false information with the intent to

deceive WaMu.

In this case, the inference drawn by the Court is supported by the fact that, in January

2012, a federal grand jury in Pensacola, Florida returned a four-count indictment against the

Debtor arising, in part, out of the Debtor's actions in obtaining the Mortgage Loan.  On April 20, 2012, the Debtor was convicted by a federal jury in the United States District Court for the Northern District of Florida, Pensacola Division, of all four counts charged against him, which included: Count One - conspiracy to commit bank and mail fraud; Count Two - bank fraud; Count Three - mail fraud; and Count Four - conspiracy to commit money laundering.  *See* Jury Verdict*, USA v. Mazzella et al.* (N.D. Fla. 2012), Case No. 3:12-cr-00009-LC-2, ECF No. 89.  In the District Court's instructions to the jury in connection with Counts Two and Three, the Judge instructed that the Debtor could only be convicted if it was proven beyond a reasonable doubt that he carried out a scheme to get money, by using material false or fraudulent pretenses or representations, with the intent to defraud.  *See* Court's Inst. to Jury, *USA v. Mazzella et al.*, ECF No. 87.  While this Court relies solely on the record before it to reach this decision, the fact that the Debtor has been convicted for actions arising in part out of this transaction is taken into account when weighing the inference from the Debtor's failure to testify.  Accordingly, based on the evidence before the Court and the totality of the facts extant, the Court finds that the Debtor intended to deceive WaMu.

*Conclusion*

For the reasons stated herein, the Court finds that the Plaintiff has proven by a preponderance of the evidence that the Mortgage Debt should be excepted from discharge pursuant to 11 U.S.C. § 523(a)(2)(B).  Accordingly, Judgment will enter in favor of the Plaintiff. The Plaintiff's request for relief from the automatic stay is hereby denied, without prejudice.


Dated: Central Islip, New York
      May 8, 2012                        **_/s/ Robert E. Grossman_**
                                     Hon. Robert E. Grossman, U.S.B.J.